Steven N. Williams (SBN 175489)
Kai'Ree K. Howard (SBN 351730)
**STEVEN WILLIAMS LAW, PC.**
201 Spear Street, Suite 1100
San Francisco, CA 94108
Telephone: 415-697-1509
Email: swillliams@stevenwilliamslaw.com
        khoward@stevenwilliamslaw.com

*Attorneys for Plaintiff & The Proposed Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHERESSE BENTON, individually and on behalf of all others similarly situated, | Case No. 4:24-cv-02217-DMR |
| Plaintiff, | |
| v. | **AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| BRIDGESTONE CORPORATION; BRIDGESTONE AMERICAS, INC. | |
| CONTINENTAL AKTIENGESELLSCHAFT; CONTINENTAL TIRE THE AMERICAS, LLC; | |
| THE GOODYEAR TIRE & RUBBER COMPANY; | |
| COMPAGNIE GÉNÉRALE DES ÉTABLISSEMENTS MICHELIN SCA; MICHELIN NORTH AMERICA, INC.; | |
| NOKIAN TYRES PLC; NOKIAN TYRES INC.; NOKIAN TYRES U.S. OPERATIONS LLC; | |
| PIRELLI & C. S.P.A.; PIRELLI TIRE LLC; | |
| Defendants. | |

**TABLE OF CONTENTS**

NATURE OF THE ACTION ...................................................................................................... 1

JURISDICTION AND VENUE .................................................................................................. 2

PARTIES ...................................................................................................................................... 4

    A.  PLAINTIFF ...................................................................................................................... 4

    B.  DEFENDANTS .................................................................................................................. 4

        1.  Bridgestone Defendants ........................................................................................ 4

        2.  Continental Defendants ......................................................................................... 5

        3.  Goodyear Defendants ............................................................................................ 5

        4.  Michelin Defendants .............................................................................................. 5

        5.  Nokian TyresDefendants ....................................................................................... 6

        6.  Pirelli Defendants .................................................................................................. 7

        7.  Agents and  Co-Conspirators ................................................................................ 7

FACTUAL ALLEGATIONS ...................................................................................................... 8

    A.  Replacement Tires are a Commodity, and Consumers at the End of the Chain of
        Distribution Bear the Burden of Overcharges ............................................................ 8

    B.  High Concentration in the Market for Replacement Tires Fosters and Facilitates
        Collusion ....................................................................................................................... 13

    C.  Barriers to Entry in the Replacement Tires Market Foster and Facilitate Collusion
        ....................................................................................................................................... 14

    D.  The Diffuse Nature of the Buy-Side of the Replacement Tires Market Fosters and
        Facilitates Collusion .................................................................................................... 14

    E.  People Need to Purchase Replacement Tires, Facilitating Collusion ........................... 14

    F.  The Commodity Nature of Replacement Tires Makes Them a Desirable Product to
        Price-Fix ....................................................................................................................... 14

    G.  Defendants Carried out Their Conspiracy and Raised the Prices of Replacement Tires
        During the Class Period ............................................................................................... 15

        1.  A Sharp, Unprecedented and Inexplicable Rise in Prices for Replacement Tires
            Took Place in the United States ........................................................................... 15

        2.  Coordination of Price Increases and Discipline Through Messaging .................... 15

ii

3.  Defendants Coordinated on Supply Reduction..................................................16

4.  European Commission Conducts Dawn Raids..............................................16

**STATUTE OF LIMITATIONS** ..........................................................................................16

**CLASS ACTION ALLEGATIONS** .....................................................................................17

FIRST CLAIM FOR RELIEF...........................................................................................21

SECOND CLAIM FOR RELIEF......................................................................................23

THIRD CLAIM FOR RELIEF..........................................................................................25

FOURTH CLAIM FOR RELIEF......................................................................................25

**PRAYER FOR RELIEF**.......................................................................................................27

**DEMAND FOR JURY TRIAL**............................................................................................28

Plaintiff Cheresse Benton, on behalf of herself and all others similarly situated (the "Class" as defined below), upon personal knowledge as to the facts pertaining to herself and on information and belief, including the investigation of counsel as to all other matters, brings suit against Defendants Bridgestone Corporation; Bridgestone Americas, Inc., Continental Aktiengesellschaft, Continental Tire the Americas, LLC, The Goodyear Tire & Rubber Company, Compagnie Générale des Établissements Michelin SCA, Michelin North America, Inc., Nokian Tyres plc; Nokian Tyres Inc., Nokian Tyres U.S. Operations LLC, Pirelli & C. S.p.A., and Pirelli Tire LLC for violations of California's Cartwright Act and Unfair Competition Law, for violations of all substantially similar state laws, and for violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

## NATURE OF THE ACTION

1.      This lawsuit arises out of a conspiracy by the world's largest tire manufacturers to artificially raise and maintain the prices of new replacement tires for cars, vans, trucks and buses ("Replacement Tires") sold in the United States. A person or entity has identified itself to the United States Department of Justice's Antitrust Division in relation to the alleged conspiracy as an applicant under the DOJ's ACPERA program, pursuant to which an entity which self-reports an antitrust violation may be excused from criminal prosecution and, if sufficient cooperation is provided to the victims of the conspiracy, may limit its civil liability.

2.      Defendants' conspiracy to fix prices for Replacement Tires was predatory and opportunistic and involved taking advantage of economic conditions caused by the COVID-19 pandemic as an excuse to raise prices. Some of these Defendants have previously been caught engaging in antitrust cartels, some in the not-distant past and involving other rubber products for automobiles. Defendant Bridgestone pled guilty in 2014 to a conspiracy involving anti-vibration rubber parts used in automobiles, not long after having pled guilty in 2011 to charges of price-fixing and violations of the Foreign Corrupt Practices Act involving the Marine Hose market. In 2008, the South African Competition Authority issued

1

fines against Goodyear and Continental for collusive activity, while Bridgestone South Africa (Pty) Ltd. escaped a fine after admitting to taking part in the alleged cartel and receiving conditional immunity after filing a leniency application with the regulator. Continental's subsidiaries participated in similar antitrust cartels involving automotive parts.

3.     Beginning on or about April 1, 2020, and with an end date presently unknown, Defendants carried out an agreement to raise and maintain prices through the exchange of pricing information, the coordination of capacity and production and other means.

4.     The European Commission recently carried out dawn raids on Defendants' corporate offices prompted by the EC's concern that the Defendants were carrying out "cartels and restrictive business practices," including illegal price coordination.

5.     Plaintiff seeks to represent a class of individuals who purchased Replacement Tires indirectly from Defendants at prices which were inflated due to Defendant's conspiracy, and seeks to recover treble damages, injunctive relief, and other relief as is appropriate, based on Defendants' violations of state and federal antitrust laws.

## JURISDICTION AND VENUE

6.     Plaintiff brings this action under the laws of the State of California and all other states, and the District of Columbia, with substantially similar laws permitting indirect purchaser actions for antitrust violations. Plaintiff also asserts a claim under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1). Plaintiff seeks all remedies permitted by these laws on behalf of the Class, including treble damages and the recovery of attorneys' fees and costs.

7.     This Court has subject matter jurisdiction over this case as it is based on state law claims and is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Class are citizens of states different from some Defendants. 28 U.S.C. §§ 1332(d) and 1367.

2

This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.

8.      Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

9.      This Court has *in personam* jurisdiction over Defendants because each, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Replacement Tires throughout the United States as a whole, including in this District; (c) had substantial aggregate contacts with the United States, including in this District; or (d) engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

10.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States. The activities of Defendants and their co-conspirators were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States.

11.     Defendants' unlawful activities substantially affected commerce throughout

3

the United States, causing injury to Plaintiff and members of the Class. Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices of Replacement Tires in the United States, which conspiracy unreasonably restrained trade and adversely affected the market for Replacement Tires.

12.     Defendants' conspiracy and wrongdoing caused antitrust injury to consumers at the end of the chain of distribution in the United States who absorbed passed-on overcharges when they purchased Replacement Tires in the United States not for resale.

## PARTIES

### A.     PLAINTIFF

13.     Plaintiff Cheresse  Benton is a resident of the State of California. Benton purchased Michelin brand Replacement Tires at a retail tire establishment in Millbrae, California during the Class Period and paid unlawfully inflated prices as a result.

### B.     DEFENDANTS

#### 1.     Bridgestone Defendants

14.     Defendant Bridgestone Corporation is organized under the laws of Japan with its principal place of business at 1-1, Kyobashi 3-chome, Chuo-ku, Tokyo Japan 104-8340. Bridgestone Corporation is the parent corporation of the Bridgestone Group (the "Group"), which refers to all Group companies, including Bridgestone Americas ("BSAM"), Bridgestone China, Asia Pacific ("BSCAP"), Bridgestone Europe, Russia, Middle East, India, and Africa ("BSEMIA"), and Bridgestone Japan ("BSJP"). Bridgestone Corporation is the world's largest tire and rubber company.

15.     Defendant Bridgestone Americas, Inc. ("BSAM") is a subsidiary of Bridgestone Corporation incorporated under the laws of Nevada with its principal place of business at 200 4th Ave, Suite 100, Nashville, TN, 37201-2256. BSAM and its subsidiaries develop, manufacture, and sell Replacement Tires.  BSAM has manufacturing operations in Arkansas, Georgia, Iowa, Illinois, North Carolina, Ohio, South Carolina, Tennessee, and Texas.

4

16.     Bridgestone Corporation and BSAM are referred to collectively as "Bridgestone."

**2.      Continental Defendants**

17.     Defendant Continental Aktiengesellschaft ("Continental AG)," is a German company with its headquarters at Vahrenwalder Strasse 9, 30165, Hannover, Germany. Continental AG manufactures and sells tires. Continental AG has extensive operations throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the Class Period, Continental AG manufactured, sold, and/or imported tires to purchasers in the United States and elsewhere, directly and through predecessors, affiliates, and subsidiaries.

18.     Defendant Continental Tire the Americas, LLC ("Continental U.S.") is a United States subsidiary of Continental AG incorporated under the laws of Ohio, with its principal place of business at 1830 MacMillian Park Drive, Fort Mill, SC 29707. Continental U.S. manufactures and distributes tires. Continental U.S. sells its tires through independent tire dealers, car dealers, and mass retail companies across North America. Continental U.S. has manufacturing facilities across the United States, including in Barnseville, Georgia; Mt. Vernon, Illinois; Sumter, South Carolina; and Jackson, Missouri.

19.     Continental AG and Continental U.S. are referred to collectively as "Continental."

**3.      Goodyear Defendant**

20.     Defendant The Goodyear Tire & Rubber Company ("Goodyear") is a corporation organized under the laws of the State of Ohio with its principal place of business at 200 Innovation Way, Akron, OH 44316-0001. Goodyear manufactures and sells Replacement Tires under multiple brand names including Goodyear, Cooper, Dunlop, Kelly, Debica, Sava, Fulda, Mastercraft, and Roadmaster.

**4.      Michelin Defendants**

21.     Defendant Compagnie Générale des Établissements Michelin SCA ("CGEM") is

5

organized under the laws of France with its principal place of business at 23 place des Carmes-Déchaux, 63000 Clermont-Ferrand, France. CGEM is the Michelin Group's parent company, which directly or indirectly owns all of its subsidiaries. CGEM's two main subsidiaries are Manufacture Française des Pneumatiques Michelin ("MFPM"), a wholly-owned subsidiary that coordinates all of the Group's manufacturing, sales, and research operations in France, and Compagnie Financière Michelin ("CFM"), a wholly-owned subsidiary that owns most of the Group's manufacturing, sales, and research companies outside of France and coordinates their operations.

22.     Defendant Michelin North America, Inc. ("Michelin North America") is a U.S. subsidiary of CGEM incorporated under the laws of the State of New York with its principal place of business at One Parkway South, Greenville, SC 29615-5022. Michelin designs, manufactures, and sells Replacement Tires. Michelin is one of the largest manufacturers of tires in the United States and has manufacturing operations in several states.

23.      CGEM and Michelin North America are referred to collectively as "Michelin."

**5.     Nokian Tyres Defendants**

24.     Defendant Nokian Tyres plc is organized under the laws of Finland with its principal place of business at Pirkkalaistie 7, P.O. Box 20, 37101 Nokia, Finland. Nokian Tyres plc is the parent company of the Nokian Tyres Group, which includes subsidiaries worldwide. Nokian Tyres plc develops and manufactures Replacement Tires

25.     Defendant Nokian Tyres Inc. is a fully owned subsidiary of Nokian Tyres U.S. Holdings Inc. and an indirect subsidiary of Nokian plc with its principal place of business at 501 Union Street, Nashville, TN 37219. Nokian Tyres operates a manufacturing facility in Tennessee.

26.     Defendant Nokian Tyres U.S. Operations LLC is a limited liability company organized under the laws of the State of Tennessee with its principal place of business at 520 Nokian Tyres Drive, Dayton, TN, 37321. It is a wholly-owned subsidiary of Nokian Tyres U.S.

Holdings Inc., and an indirect subsidiary of Nokian Tyres plc.

27.     Nokian Tyres plc, Nokian Tyres Inc., and Nokian Tyres U.S. are referred to collectively as "Nokian."

### 6.     Pirelli Defendants

28.     Defendant Pirelli & C. S.p.A. ("Pirelli") is organized under the laws of Italy with its principal place of business at Via Bicocca degli Arcimboldi, 3, 20126 Milano MI, Italy. Pirelli designs, manufactures, and distributes Replacement Tires.

29.     Defendant Pirelli Tire LLC ("Pirelli Tire") is a subsidiary of Pirelli incorporated under the laws of Delaware with its principal place of business located at 100 Pirelli Drive, Rome, GA 30161. Pirelli Tire's facilities include a research and development center at its Rome, Georgia headquarters, as well as offices in various cities throughout the United States. The company manufactures, distributes, and sells Replacement Tires.

30.     Pirelli  and Pirelli Tire are referred to collectively as "Pirelli."

### 7.     Agents and Co-Conspirators

31.   At all relevant times, each Defendant acted as the principal or agent for Defendants with respect to the acts, violations, and common course of conduct alleged.

32.     Various other individuals, firms and corporations, not named as Defendants herein, may have participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy. Plaintiff reserves the right to subsequently name some or all of these persons as defendants.

33.     Whenever reference is made in this Complaint to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

## FACTUAL ALLEGATIONS

**A.     Replacement Tires are a Commodity, and Consumers at the End of the Chain of Distribution Bear the Burden of Overcharges**

34.     Defendants' conspiracy to raise, fix, or maintain the price of Replacement Tires at artificially high levels resulted in harm to Plaintiffs and the Class because it resulted in them paying higher prices for Replacement Tires than they would have in the absence of Defendants' conspiracy.

35.     Replacement Tires are commodity-like products , i.e., Replacement Tires manufactured by different Defendants are functionally equivalent to each other. Defendants manufacture tires pursuant to standard specifications.

36.     Replacement Tires are traceable and identifiable throughout the chain of distribution to the end user. They do not undergo any physical alterations as they move through the chain of distribution.

8



37.     Plaintiff and the Class purchased Replacement Tires through resellers. These Replacement Tires followed a traceable physical chain from the Defendants to distributors to the final consumer of the tire. Tracing can help show that changes in the prices paid by direct purchasers of Replacement Tires (e.g., distributors and retailers) affect prices paid by indirect purchasers of Replacement Tires. Just as Replacement Tires can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Replacement Tires affect prices paid by indirect purchasers of Replacement Tires.

9

38.    The distributor and retail markets for Replacement Tires are subject to vigorous price competition. The distributors and retailers of Replacement Tires have thin margins. They are therefore at the mercy of their costs, such that increases in the price of Replacement Tires lead to quick, corresponding price increases at the distributor and retail levels for Replacement Tires. When downstream distribution markets are highly competitive, as they are in the case of Replacement Tires, overcharges are passed through to ultimate consumers, such as Plaintiff and Class.[1] See Figure 1 below



39.    To the extent that distributors, wholesalers, and retailers selling to consumers or to others in the distribution chain price their sales as their cost plus a fixed markup, this will create an additional reason for pass through of overcharges to purchasers of replacement tires, and indeed for that pass-through to exceed the overcharge by tire manufactures.[2]

---

[1] Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics 8th edition* (Pearson, 2013), 310-312.

[2] For example, if a wholesaler prices its tires at manufacturer sales price plus 10 percent, and a retailer prices its product at wholesale plus 10 percent, the total pass through to the final consumer will be 121 percent (i.e., 110 percent times 110 percent) of manufacturer sales price.

40.     Even where downstream competition is not as vigorous, suppliers pass price increases downstream to indirect purchasers. For example, a monopolist would also increase its prices when the cost of its inputs increased. The degree of cost pass-through increases with the degree of competition in the market.[3] Figure 2 illustrates the standard economic framework of cost pass-through for a firm in a less competitive setting. The extent of the price increase may depend on the degree of competition and consumers' responses to higher prices, but in all cases the response is a price increase to consumers.



41.     As a result, the inflated prices of Replacement Tires resulting from Defendants' price fixing conspiracy have been passed on to Plaintiffs and the Class by distributors and retailers. Thus, Plaintiffs and members of the Class have been forced to pay supracompetitive prices for Replacement Tires.

42.     The economic literature has recognized that overcharges in an upstream product normally result in higher prices for the products when sold downstream. Two antitrust

---

[3]Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics 8th edition* (Pearson, 2013), 363-367.

4:24-cv-02217-DMR
Amended Class Action Complaint and Jury Demand

scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-level chain of distribution, *passing on monopoly overcharges is not the exception: it is the rule*".[4]

43.     As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Certification), an economist who presented evidence in indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the class certification order in that case):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers…Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

44.     The extent to which input cost increases are passed through into output prices is entirely an empirical issue, and it is an area in which methods of empirical analysis are well established. Based on both theory and the published studies in this area, it is likely that the pass-through rates of inflated costs on Replacement Tires will exceed 100 percent, a situation known as "overshifting." In their analysis of pass-through, economists use a statistical methodology to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That methodology – called regression analysis - is commonly used

---

[4] Robert G. Harris and Lawerence A. Sullivan, "Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis," *The University of Pennsylvania Law Review* 128, no. 2 (December 1979): 276.

in the real world and in litigation to determine the impact of an increase in the upstream cost on prices in downstream markets. Thus, it is possible to confirm and quantify the impact of an increase in the upstream price cost of tires on the retail price of replacement tires. A regression model can explain how variation in Defendants' prices of tires changes the price of replacement tires. In such models, the downstream retail price of replacement tires would be treated as the dependent variable and upstream cost as the independent (or explanatory) variable. The model can isolate how changes in the upstream prices of tires impact the price of replacement tires while controlling for the impact of other price-determining factors. Using this regression model, the amount by which the overcharge increased the prices of Replacement Tires can be measured and quantified. Therefore, commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive prices passed-through the chain of distribution. Thus, the economic harm to Plaintiffs and class members can be quantified.

45.    The United States Tire Manufacturers Association ("USTMA") projects total U.S. tire shipments of 334.2 million units in 2023, compared to 332.0 million units in 2022 and 332.7 million units in 2019. The estimated size of the Replacement Tires market in the United States amounted to around $61 billion in 2022.

46.    Each Defendant sells Replacement Tires

**B.    High Concentration in the Market for Replacement Tires Fosters and Facilitates Collusion**

47.    A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

48.    The market for Replacement Tires in the United States is concentrated. Defendants Bridgestone, Michelin, and Goodyear made up almost 2/3 of the market just by themselves, and other Defendants have substantial market shares.

49.    This concentration makes the tire market more susceptible to cartelization. With fewer competitors, the coordination and trust problems that can prevent cartel

formation or stability become easier to overcome. A smaller number of negotiators makes it easier for the conspirators to agree on a cartel price, allocate market shares, conceal their collusion, develop enforcement mechanisms, and detect and punish cheaters.

### C.    Barriers to Entry in the Replacement Tires Market Foster and Facilitate Collusion

50.     Theoretically, a cartel would be restrained if it were reasonably practicable for competitors to enter the market and undercut the cartelists.  Barriers to entry in markets – i.e., the high costs of constructing plants and the difficulty of receiving permitting to begin production – can preclude new entrants from entering a market. The market for Replacement Tires has high barriers to entry.

### D.    The Diffuse Nature of the Buy-Side of the Replacement Tires Market Fosters and Facilitates Collusion

51.     The vast majority of Defendants' customers are independent tire dealers, who in turn sell to consumers.

52.     Because the buy-side of the Replacement Tires market is not concentrated, collusion is facilitated. With a large number of buyers, each contributing a small portion to the market, there is less incentive for cartel members to undermine agreed-upon pricing. The risk of disrupting the collusive pricing agreements carries large penalties, especially considering the relatively minor individual sales involved.

### E.    People Need to Purchase Replacement Tires, Facilitating Collusion

53.     Consumers need to buy tires on a regular basis in order to maintain a safe vehicle. Because of this, price increases do not have a significant impact on demand,  because consumers do not have the option of buying a substitute for a tire, or not replacing their tires. Thus, demand is relatively inelastic even when prices are increased.

### F.    The Commodity Nature of Replacement Tires Makes Them a Desirable Product to Price-Fix

54.     Defendants make similar models of Replacement Tires, e.g., all-season, all-terrain, winter/snow, and summer. Within each type-category, Replacement Tires do not

14

differ significantly in quality, appearance, or use. Thus, Replacement Tires are functionally interchangeable.

55.     When products are interchangeable as in the case of Replacement Tires, the primary way to compete is on the basis of price. Avoiding  price-based competition is the primary reason to form a cartel. Thus, cartels are more likely when the participants sell interchangeable  products. Because Replacement Tires are essentially interchangeable and because of the nature of the Replacement Tires market as described above,  cartel behavior is facilitated because, *inter alia*, cartel members can more easily monitor and detect defections from a price- fixing agreement.

### G.     Defendants Carried out Their  Conspiracy and Raised the Prices of Replacement Tires During the Class Period

#### 1.     A Sharp, Unprecedented and Inexplicable Rise in Prices for Replacement Tires Took Place in the United States

56.     Since approximately 2020, after the onset of the pandemic, uncharacteristic and dramatic price increases began to occur in the Replacement Tires market.  Price increases have outpaced inflation, with no logical explanation, and Defendants have repeatedly raised prices at about the same times in about the same amounts. According to ProPublica, the average price of Replacement Tires rose at a pace 70% higher than core inflation during the relevant time period.

#### 2.     Coordination of Price Increases and Discipline Through Messaging

57.     Defendants made public announcements and public statements on earnings calls to coordinate with each other and to communicate their intentions concerning price increases and production limitations.

58.     Coordinated price increases for Replacement Tires began in December 2020 when Michelin announced an increase of 5% taking effect February 1, 2021. Others, including Continental, followed within a month.

59.     Just a short time later, Michelin announced an 8% price increase. Two days later Goodyear followed with an identical increase, followed by price increases by  Pirelli

15

(7%) and Bridgestone (8%).

60.     Price increases continued from 2021 throughout 2023, with each of the Defendants repeatedly raising its prices in similar amounts at or about the same times.

61.     As ProPublica reported, corporate executives noticed that when they raised prices, consumers continued to purchase their products.

62.     Despite Defendants' claims regarding raw material shortages and costs, a spokesman for Bridgestone Tires reported in May 2022 that the company had not experienced any production disruptions. "We monitor all critical raw materials and global logistics closely and do not foresee any impacts to our supply at this time."

### 3.     Defendants Coordinated on Supply Reduction

63.     Cartelists have long recognized that a very effective way to make prices rise is to cut supply. Defendants began colluding on the supply of Replacement Tires in 2020.

64.     Goodyear stated that "we reduced production in the fourth quarter of 2022 at most of our Tire manufacturing facilities, resulting in a reduction of approximately 3.5 million units compared to production in the fourth quarter of 2021."

65.     Defendants acknowledged that "capacity discipline" had to be exercised by each of them. As Goodyear CEO Richard Kramer explained during a 2023 earnings call, Goodyear's "focus [is] on making sure we're not putting too many Tires in inventory that could impact negatively that supply-demand equation." He further noted that "[t]here's a lot of manufacturing capacity in the industry. And like we did with Cooper, we need to think about how we can use that capacity more wisely as we move ahead."

### 4.     European Commission Conducts Dawn Raids

66.     Defendants' European corporate offices were the subject of dawn raids on January 30, 2024, based on an investigation of a suspected price-fixing conspiracy among the tire manufacturers.[78]

### STATUTE OF LIMITATIONS

67.     Plaintiff and the Class did not know and could not have known of Defendants'

illegal conduct until the European Commission announced dawn raids in the tire industry on January 30, 2024. Before then, Plaintiff and the Class had no reason to believe that they paid prices for Replacement Tires that were affected by Defendants' illegal conduct, and thus had no duty until then to investigate the claims set forth in this Complaint.

68.     Additionally, Defendant made public statements attributing price increases to non-collusive factors. These pretextual statements were intended to communicate that the prices for Replacement Tires were being set by market factors rather than collusion.

69.     Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiff and the Class, the various statutes of limitations governing the claims alleged herein were tolled at least until January 30, 2024, pursuant to the injury-discovery rule and the doctrine of fraudulent concealment.

<u>**CLASS ACTION ALLEGATIONS**</u>

70.     Plaintiff brings this action on behalf of herself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following class:

> All persons or entities that purchased Replacement Tires indirectly, for use and not for resale, from Defendants from April 1, 2020 until the time that the adverse effects of Defendants' anticompetitive conduct ceased (the "Class Period").

The specific states are set forth in each claim for relief below.

71.     Plaintiff and the class also seek equitable and injunctive relief under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

72.     Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, the Court, its staff and any jury which hears this case, and persons who purchased Replacement Tires

17

directly or for resale.

73.     There are millions of Class members geographically dispersed throughout the United States, such that joinder of all Class members in the prosecution of this action is impracticable.

74.     Plaintiff's claims are typical of the claims of the Class as she purchased Replacement Tires during the Class Period from an entity that is not a Defendant or owned by a Defendant. Plaintiff and all Class members were damaged in the same manner by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

75.     Numerous questions of law or fact common to the Class arise from the claims asserted against Defendants, including but not limited to:

> a.   Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, and stabilize the prices for Replacement Tires;
>
> b.    The identity of the participants of the alleged conspiracy;
>
> c.   The duration of the alleged conspiracy and the nature and character of the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;
>
> d.   Whether the alleged conspiracy violated California's Cartwright Act and substantially similar state laws;
>
> e.   Whether the alleged conspiracy violated California's Unfair Competition Law and substantially similar state laws;
>
> f.   Whether the alleged conspiracy violated the Sherman Act;
>
> g.   Whether Defendants unjustly enriched themselves to the detriment of Plaintiff and the Class members, thereby entitling Plaintiff and Class

18

members to disgorgement of all benefits derived by Defendants from Plaintiff and the Class;

h.  Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and Class members;

i.  The effect of Defendants' conspiracy on prices of Replacement Tires sold in the United States during the Class Period;

j.  Whether Plaintiff and Class members were on notice of any fact which should have caused them to investigate whether Defendants were engaged in a price-fixing conspiracy which had caused them damages;

k.  Whether Defendants and their co-conspirators fraudulently concealed the existence of the alleged conspiracy from Plaintiff and Class members;

l.  The appropriate measure of damages, disgorgement, restitution and other relief for the Class; and

m. The appropriate injunctive relief.

113.    Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all Class members are similarly affected by Defendants' wrongful conduct in that they paid artificially-inflated prices for Replacement Tires purchased indirectly from Defendants or their co-conspirators.

114.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by counsel who are competent and experienced in the prosecution of complex antitrust and class action litigation involving this specific subject matter.

115.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

116.    Class action treatment is superior to other methods for the fair and efficient adjudication of this controversy because:

      A.    It will avoid a multiplicity of suits and consequent burden on the courts and Defendants;

      B.    It would be virtually impossible for all members of the Class to intervene as parties-Plaintiff in this action;

      C.    It will allow numerous persons with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation to obtain redress for their economic injuries;

      D.    It is appropriate for treatment on a fluid recovery basis, which obviates any manageability problems; and

      E.    It will provide court oversight of the claims process, once Defendants' liability is adjudicated.

117.    The Class is readily definable. Prosecution as a class action will eliminate the possibility of repetitious litigation. Class action treatment will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense, which numerous individual actions would otherwise engender. This action presents no difficulties in management that would preclude maintenance as a class action.

118.    Further, the prosecution of separate and individual actions by Class members would create a risk of inconsistent adjudications, and thereby establish incompatible standards of conduct for Defendants.

**FIRST CLAIM FOR RELIEF**
**Violations of California Cartwright Act and**
**Substantially Simliar State Antitrust Statutes**
**(on behalf of Plaintiff and the Class)**

119.    Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

120.    Plaintiff and members of the Class are "persons" within the meaning of the Cartwright Act, as defined in § 16720.

121.    With the purpose and intention of inflating the prices of Replacement Tires to artificial and supra-competitive levels, Defendants and their co-conspirators engaged in illegal, unfair and deceptive trade practices, including, but not limited to, an agreement to engage in a continuing contract, combination and conspiracy in restraint of interstate trade and commerce, in violation of the California Cartwright Act, Business and Professions Code §16720.

122.    In order to effectuate their contract, combination and conspiracy, Defendants agreed among themselves to:

    A.  Fix, raise, maintain and/or stabilize the prices of Replacement Tires in the United States;

    B.  Restrict the supply of Replacement Tires by coordinating their actions; and

    C.  Implement supra-competitive increases in the prices of Replacement Tires in the United States.

123.    These practices, conducted in furtherance of Defendants' conspiracy, had their intended effects. Defendants' illegal, unfair and deceptive trade practices have prevented or suppressed competition, and have additionally resulted in the prices for Replacement Tires being artificially high and non-competitive. Defendants benefitted from selling Replacement

21

Tires at supra-competitive prices. The illegal, unfair, and deceptive trade practices alleged in this Complaint violate the California Cartwright Act, Business and Professions Code § 16720, *et seq.*, and are, at a minimum, an unreasonable and unlawful restraint of trade.

124.    Additionally, as a direct and proximate result of Defendants' agreement and contract to restrain trade, Plaintiff and the Class have suffered injury to their businesses and properties and have been deprived of the benefits of fair competition.

125.    As a result of Defendants' unlawful conduct, Plaintiff and members of the Class have sustained damages by paying supra-competitive prices that would not have been incurred but for Defendants' unlawful conduct as alleged in this Complaint, and are entitled to recover from Defendants the full consideration paid for Replacement Tires, treble damages, and equitable relief, under the California Cartwright Act, Business and Professions Code §§ 16750(a) and 16761.

126.    Plaintiff brings claims on behalf of the Class under the following substantially similar statutes:

      A.  Ariz. Rev. Stat. Ann. §§ 44-1401, *et seq.*;

      B.  Conn. Gen. Stat. §§ 35-24, *et seq.*;

      C.  D.C. Code §§ 28-4501, *et seq.*;

      D.  Haw. Rev. Stat. §§ 480-4, *et seq.*;

      E.  740 Ill. Comp. Stat. §§ 10/1, *et seq.*;

      F.  Iowa Code §§ 553.1, *et seq.*;

      G.  Kan. Stat. Ann. §§ 50-101, *et seq.*;

      H.  Me. Rev. Stat. Ann. 10 §§ 1101, *et seq.*;

      I.  MD Code Ann., Com. Law, §§ 11-201, *et seq.*;

      J.  Mich. Comp. Laws Ann. §§ 445.771, *et seq.*;

      K.  Minn. Stat. §§ 325D.49, *et seq.*;

      L.  Miss. Code Ann. §§ 75-21-1, *et seq.*;

      M.  Neb. Rev. Stat. §§ 59-801, *et seq.*;

N.   Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*;

O.   N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*;

P.   N.M. Stat. Ann. §§ 57-1-1, *et seq.*;

Q.   N.Y. Gen. Bus. Law §§ 340, *et seq.*;

R.   N.C. Gen. Stat. §§ 75-1.1, *et seq.*;

S.   N.D. Cent. Code Ann. §§ 51-08.1-01, *et seq.*;

T.   Or. Rev. Stat. §§ 646.705, *et seq.*;

U.   R.I. Gen. Laws §§ 6-36-1, *et seq.*;

V.   S.D. Codified Laws §§ 37-1-3.1, *et seq.*;

W.  Tenn. Code Ann. §§ 47-25-101, *et seq.*;

X.   Utah Code Ann. §§ 76-10-3101, *et seq.*;

Y.   Vt. Stat. Ann. 9, §§ 2453, *et seq.*;

Z.   W.Va. Code §§ 47-18-1, *et seq.*; and

AA. Wis. Stat. §§ 133.01, *et seq.*

**SECOND CLAIM FOR RELIEF**
**Violations of the Unfair Competition Act**
**California Business and Professions Code §§ 17200, *et seq.***
**(on behalf of Plaintiffs and the Class)**

127.   Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

128.   Defendants and their co-conspirators' conduct constitutes unfair competition and unlawful business practices that are forbidden by law within the meaning of California Business and Professions Code §§ 17200, *et seq.*

129.   As noted above, Defendants' acts and practices described above are in violation of California Business Professions Code §§ 16720, *et seq.*, and are otherwise unfair, unconscionable, unlawful or fraudulent and in violation of the laws of the State of California.

23

130.   As a result of these violations of California Business and Professions Code §§ 17200 et seq., and as discussed further below, Defendants and their co-conspirators have unjustly enriched themselves at the expense of Plaintiffs and members of the Class.

131.   Defendants and their co-conspirators should be required, pursuant to California Business and Professions Code §§ 17202-04, to disgorge their illegal gains for the purpose of making full restitution to all injured Class members, as identified above.  Further, Defendants and their co-conspirators should also be permanently enjoined from any continuing violations of California Business and Professions Code §§ 17200 *et seq*.

132.   Plaintiff brings claims on behalf of the Class under the following substantially similar statutes:

    A.   Alaska Stat. §§ 45.50.471, *et seq.*;

    B.   Ark. Code §§ 4-88-101, *et seq.*;

    C.   D.C. Code §§ 28-3901, *et seq.*;

    D.   Fla. Stat. §§ 501.201, *et seq.*;

    E.   Haw. Rev. Stat. § 480-2;

    F.   Idaho Code §§ 48-601, *et seq.*;

    G.   Kan. Stat. §§ 50-623, *et seq.*;

    H.   Me. Rev. Stat. Ann. tit. 5, §§ 205A, *et seq.*;

    I.   Mass. Gen. Laws ch. 93A, §§ 1, *et seq.*;

    J.   Mo. Rev. Stat. §§ 407.020, *et seq.*;

    K.   Mont. Code Ann., §§ 30-14-201, *et seq.*;

    L.   Neb. Rev. Stat. §§ 59-1601, *et seq.*;

    M.   N.H. Rev. Stat. Ann. §§ 358-A, *et seq.*;

    N.   N.M. Stat. Ann. §§ 57-12-1, *et seq.*;

    O.   N.Y. Gen. Bus. Law §§ 349, *et seq.*;

    P.   N.C. Gen. Stat. §§ 75-1, *et seq.*;

    Q.   R.I. Gen. Laws §§ 6-13.1-1, *et seq.*;

24

R.   S.C. Code Ann. §§ 39-5-10, *et seq.*;

S.   Utah Code §§ 13-5-1, *et seq.* and Utah Code §§ 13-11-1, *et seq.*; and

T.   VT Stat. Ann., tit. 9, §§ 2451, *et seq.*

### THIRD CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiff and the Class)

133.   Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint, and further alleges as follows.

134.   To the detriment of Plaintiff and members of the Class, Defendants have been and continue to be unjustly enriched as a result of the unlawful practices alleged herein. Defendants have unjustly benefitted by receiving higher prices for Replacement Tires which would otherwise not have been possible absent Defendants' wrongful conduct.

135.   Between the parties, it would be unjust for Defendants to retain the benefits obtained by their unlawful practices. Accordingly, Plaintiff and members of the Class seek full restitution of Defendants' enrichment, benefits and ill-gotten gains acquired as a result of the unlawful and wrongful conduct alleged herein.

### FOURTH CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiff and the Class)

76.   Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

77.   Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

78.   The acts committed by all Defendants as part of, and in furtherance of, their contract, combination, or conspiracy, were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

79. At least as early as April 1, 2020, and continuing through approximately the end of January of 2024, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade in order to artificially fix, raise, stabilize and control prices for Replacement Tires and thereby created anti-competitive effects.

80. Defendants' anti-competitive acts were intentionally directed toward the United States market for Replacement Tires and toward purchasers of Replacement Tires in the United States, and had a substantial and foreseeable effect on interstate commerce by raising and fixing the prices for Replacement Tires throughout the United States.

81. Defendants' conspiratorial acts and combinations have created and caused unreasonable restraints in the market for Replacement Tires.

82. As a result of Defendants' unlawful conduct, Plaintiff and other Class Members who purchased Replacement Tires have been harmed by being forced to pay inflated, supra-competitive prices for Replacement Tires.

83. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators committed those acts that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

84. Defendants' conspiracy had the following effects, among others:

    a. Price competition in the market for Replacement Tires has been restrained, suppressed, and/or eliminated in the United States;

    b. Prices for Replacement Tires sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

26

c.    Plaintiff and members of the Class who purchased Replacement Tires indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

85.    Plaintiff and members of the Class have been injured and will continue to be injured in their businesses and properties by paying more for Replacement Tires purchased indirectly from Defendants and their co-conspirators than they otherwise would have paid and will pay in the absence of the conspiracy.

## PRAYER FOR RELIEF

Accordingly, Plaintiff respectfully requests that:

1.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

2.    The unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

a.    An unlawful combination, trust or agreement in violation of the California Cartwright Act and substantially similar state statutes.

b.    A violation of the California Unfair Business Practices Act and substantially similar state statutes; and

c.    An unlawful combination, trust or agreement in violation of Section 1 of the Sherman Act.

d.    Acts of unjust enrichment by Defendants as set forth herein.

3.    Plaintiff and members of the Class recover damages jointly and severally against all Defendants, and that a joint and several judgment in favor of Plaintiff and the Class against Defendants be entered against in an amount to be trebled to the extent such laws permit;

4.    Plaintiff and members of the Class recover damages, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

27

5.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.      Plaintiff and members of the Class be awarded interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

7.      Plaintiff and members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

8.      Plaintiff and members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: May 6, 2024

Respectfully submitted

Steven N. Williams
Steven N. Williams (SBN 175489)
Kai'Ree K. Howard (SBN 351730)
**STEVEN WILLIAMS LAW, P.C.**
201 Spear Street, Suite 1100
San Francisco, CA 94105
Telephone: 415-697-1509
Email:swilliams@stevenwilliamslaw.com
khoward@stevenwilliamslaw.com

*Counsel for Plaintiff and the Proposed*

28